VICTORIA F. HINKLE AND CLARENCE R. HINKLE, BY VICTORIA F. HINKLE, HIS GUARDIAN AD LITEM v. J. W. BERG, AS EXECUTOR OF THE ESTATE OF MARY P. CHANCE HINKLE, DECEASED.[1]

July 13, 1923.

No. 23,455.

**Contract to make will is not proved by single witness.**

1. The uncorroborated testimony of a single witness, though only remotely interested in the result, properly *held* insufficient to prove a contract to make a will. In such a case, the evidence is given close scrutiny, and, in order to warrant a recovery, the proof must be clear, satisfactory and convincing. Greenfield v. Peterson, 141 Minn. 475, followed and applied.

**Denial of new trial proper.**

2. A new trial properly refused when the new evidence urged as a ground therefor is equivocal in nature, and not of sufficient probative force to affect the result.

[1]Reported in 194 N. W. 637.

Action in the district court for Morrison county to enforce specific performance of an oral contract. The case was tried before Parsons, J., who made findings and ordered judgment in favor of defendant. From an order denying their motions to amend the findings and conclusions or for a new trial, plaintiffs appealed. Affirmed.

E. P. Adams and A. H. Vernon, for appellants.

C. Rosenmeier, for respondent.

STONE, J.

In this action to enforce an alleged oral contract to make a will, there were findings for defendant. The plaintiffs appeal from the order denying their motion for a new trial.

The alleged contract was made, if at all, with Mary P. Chance, on behalf of plaintiffs by their father, B. J. Hinkle. Mr. Hinkle was then a widower, Mrs. Chance a widow, and plaintiffs about 3 and 4 years old.

Mrs. Chance had lost a son, and her motherly disposition was such that, as it is claimed, she longed for the companionship of children, and the responsibility attendant upon their proper upbringing. In that situation the agreement is claimed to have been made. Mr. Hinkle's testimony, the only proof of it, is this:

"She stated that if she could have the bringing up of the children [the plaintiff's], have the care of the children, and have their companionship, she would bring them up just the same as if they were her own children; and that if the necessity arose, or if anything should happen to me, that she would use some of her own funds, if necessary, for their education, and that at her death all the property which she had should belong to the children. I told her that if she would not ask me to relinquish my right as the children's father and if she would not ask to separate the children from me and would rear them the same as if they were her flesh and blood that I would consent to her proposition. I further stated that if I should die prior to the children becoming of age that she should be the sole guardian of the children, and the agreement was made to that effect."

This was in September of 1906. The children did not then take up their residence with Mrs. Chance. Their situation was not altered in the least, *nor did any change take place until November 5, 1906, when Mrs. Chance became Mrs. Hinkle.* Then, and not until then, did she assume any duties or relationship to the plaintiffs. Then a family home was established, in which plaintiffs have been reared, receiving from their stepmother care and affection admirably maternal in character.

Mrs. Hinkle died December 9, 1920. In October, 1918, she made a will, leaving a third of her estate to her husband, and making substantial legacies to the plaintiffs, but leaving the bulk of her property to others. She ignored her obligations, if any, under the agreement sued on. A few days before her death she executed a codicil, of the making of which her husband was cognizant. Mr. Hinkle, a man of broad business experience and proved executive ability, never took any steps to put the alleged agreement in any more satisfactory shape than it was left by the conversation of September, 1906, his testimony concerning which is above quoted. It was not thereafter the subject of any discussion between them. There is no evidence leading satisfactorily, or at all, to the conclusion that the agreement was ever considered or recognized by Mrs. Hinkle as of a contractual nature.

1. We agree with the learned trial court. The existence of the alleged contract "is not satisfactorily proven." Mr. Hinkle's evidence is without corroboration. The agreement is so unusual that it is very improbable that Mrs. Hinkle ever was of the mind that it was a contract. The circumstances are such, lapse of time and family relationship considered, that it is altogether possible that Mr. Hinkle, with no evil motive, has permitted mere expression of intention to take on, in retrospect, a contractual aspect. Suggestion and self interest have worked many a stranger result. The psychology of these cases, as much as anything, has led to the adoption of the rule that the evidence therein will receive strict scrutiny, and that the defendant must prevail unless the plaintiff has established a case by evidence "clear, satisfactory and convincing." See Greenfield v. Peterson, 141 Minn. 475, 170 N. W. 696, and cases cited.

2. The new evidence urged as a ground for a new trial requires no discussion. A proper discretion was exercised in denying the motion. All else aside, it is quite apparent that the new evidence, given the utmost weight that can be claimed for it, could not have changed the result. It was mostly of an equivocal nature in that the statements attributed to Mrs. Hinkle, if made, could be considered as springing from her affection for plaintiffs, as well as from any contract concerning them. In such cases, there are many conversations about family affairs, which at the time being and subsequently, are referred to as agreements, and yet they are not at all of a contractual nature, in that the promises in question are not made with contractual intent, or for a valuable consideration, or with respect to legal obligations.

The order appealed from is affirmed.